# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **TPI CLOUD HOSTING, INC.** | § | |
| | § | |
| **v.** | § | **No. 1:19-cv-0808 JRN** |
| | § | |
| **KELLER WILLIAMS REALTY, INC.** | § | |

## <u>ORDER</u>

Before the Court is TPI Cloud Hosting, Inc.'s Motion to Compel Further Responses and Production of Documents (Dkt. No. 22); and Keller Williams' Cross-motion to Compel (Dkt. No. 29), as well as the associated responses and replies. Both motions have been referred to the undersigned for resolution.

TPI brought this suit complaining that Keller Williams breached a contract between the two companies. It contends Keller Williams hired it to develop a software application and agreed to pay it $1.8 million for the work. In addition to claiming that Keller Williams breached the parties' contract, TPI also asserts claims for quantum meruit and promissory estoppel claims, as well as fraud and misappropriation of trade secrets. In brief, TPI alleges that Keller Williams contracted TPI to create a custom software application for Keller Williams, intended to be deployed to Keller William's entire sales staff. TPI claims that the parties agreed that TPI would be paid $1.8 million, in six monthly installments of $300,000, for its work.[1] After a few months, and receipt of two $300,000 invoices, Keller Williams instructed TPI to stop work on the app, and has not paid either invoice. In the motions before the Court, both parties complain that the other has failed to adequately respond to discovery requests.

---

[1] Surprisingly, given the $1.8 million price tag, there is no written contract between the parties.

# I. TPI's Motion to Compel

TPI's motion requests the Court to compel Keller Williams to produce three categories of information: (1) documents related to software applications that Keller Williams developed, which TPI contends make use of TPI's trade secrets; (2) documents that Keller Williams has designated as privileged; and (3) interrogatories asking who made the decision not to pay the two $300,000 invoices, and when the decision was made.

## A. Mobile Command and KW Command

In seven[2] requests for production, TPI requests that Keller Williams produce virtually all documentation underlying software Keller Williams developed after terminating TPI's work ("KW Command" and "Mobile Command"). TPI contends the documents relate to its theft of trade secrets claim. Though TPI characterizes the requests as "narrowly tailored," as Keller Williams notes, the requests are from "narrow." Dkt. No. 29 at 8. Indeed, the first of the requests (RFP No. 6) seeks "ALL DOCUMENTS CONCERNING software application(s) KW developed and/or had third parties develop under KW's internal project name(s) "KW Labs," "Operation Leapfrog," "KW Command," and/or "Mobile Command. . . ." Dkt. No. 22-1 at 25. The other requests seek such things as documents concerning KW's collection of its agents' data, the actual code for the applications, records of the use of the applications by Keller Williams' agents, and any communications Keller Williams had with third parties regarding development of the applications.

---

[2]The motion refers to "nine" requests on this topic, citing to each of the nine requests for production contained in TPI's Second Request for Production of Documents. *See* Dkt. Nos. 22 at 6-7 & 22-1 at 23-27. Two of these requests, however, seek documents related to Keller Williams' decision not to pay the invoices TPI sent it, and do not request any documents regarding the Mobile Command or KW Command software. *See id.* at RFP Nos. 9 & 11.

To explain the relevance of these requests, TPI states that:

> TPI's Second RFP is directly relevant to its trade secret misappropriation claim and the resulting damages. In 2015, TPI provided the fundamental concept for the KW Command and Mobile Command software applications to KW as well as a multitude of features, functions, and purposes for those applications. TPI's creation and development of the software application was referred to internally by KW as "Operation Leapfrog" and "Mobile Command." Subsequently, after misappropriating TPI's trade secrets, terminating TPI's work on the applications, and developing the applications internally, KW released software applications containing many of the same functions and features that TPI provided to KW that were, unsurprisingly, titled "KW Command" and "Mobile Command."

Dkt. No. 22 at 7 (exhibit citations omitted). Keller Williams challenges this characterization, noting that "[w]hat TPI fails to mention is that **the only work product that TPI ever sent Keller Williams was a 'storyboard' PDF mockup of what the software application would look like**. TPI never sent any software, code, or even a usable version of the software application to Keller Williams." Dkt. No. 29 at 8 (emphasis original).[3] It further notes that "several hundred people have worked on [KW Command and Mobile Command] over a period of several years, including a *current* full-time staff of approximately 75 people are working on the projects—as well as three different design firms." *Id.* (emphasis original). Keller Williams contends that given the paucity of work TPI provided it, TPI is not entitled to the records of the detailed, years-long work Keller Williams did to create its applications. TPI replies that the fact it did not complete the application does not undermine the relevance of its requests for these documents, because trade secret protection extends not only to software or code, but also to "all forms and types of information." Dkt. No. 31 at 3. It asserts that it "introduced revolutionary ideas, concepts, design components, and know-how

---

[3]TPI denies that it never delivered Keller Williams any software, as "Mary Tennant, a board member, sent an email after she and the CEO personally saw the functioning prototype of the App extolling its virtues." Dkt. No. 31 at 1. The email, however, does not indicate what Tennant and the CEO were shown, nor does it suggest that TPI gave Keller Williams possession of any software.

to KW," and those allegations are sufficient to support its broad requests for production. The Court disagrees.

It is plain from TPI's petition and its briefing that it bases its theft of trade secrets claim on allegations that Keller Williams misappropriated broad concepts and ideas TPI contends it originated. While TPI is correct that to prevail on a trade secret misappropriation claim a plaintiff need not demonstrate that its software code was stolen and used, this does not mean that a trade secrets claim like TPI's—one based on the theft of ideas and concepts, as opposed to actual source code—entitles such a plaintiff to discover all of the documents and information underlying software that supposedly co-opted those ideas and concepts. Given the generality of TPI's trade secret claim and the fact that it does not rely on any allegation that Keller Williams used TPI's source code or other tangible property to develop the two applications at issue, the Court does not believe TPI is entitled to the broad information it has requested. Keller Williams has offered to produce " the entire, complete, usable applications for KW Command and Mobile Command. . . . " Dkt. No. 29 at 9.[4] At this stage, based on the factual allegations in the current petition, the Court believes that the production of the software is an appropriate response to the requests. And while there may be additional material TPI is entitled to discover (*e.g.*, documents indicating the features and objectives Keller Williams directed its developers to include in its software, or documents indicating that Keller Williams forwarded to its developers materials prepared by TPI), it has not propounded such narrowly tailored requests.

---

[4]It appears from a later-filed document that the software has now been produced to TPI. *See* Dkt. No. 39 at 3 n.4.

**B.    Privileged documents**

Next, TPI challenges the entirety of Keller William's privilege log, based on one assertion

of privilege that TPI believes was unjustified.  Specifically, Keller Williams produced an email from

its CFO to its general counsel (Jamie Jatzlau), with the shaded sentence redacted:

> Jamie - attached is the first invoice of 6 from TPI cloud hosting for the $1.8 million
> total KWRI will be paying them for the software development. We will hold off on
> paying until we get a LOU or whatever agreement you feel is most appropriate in
> place. Chris can provide further details on the work they will be doing.

Dkt. No. 22-1 at 154.  Prior to this, TPI had obtained the same email, without redaction.[5]  Claiming

that the redaction was plainly improper, TPI now challenges every document on Keller Williams'

privilege log, and contends that "[t]he Court should order KW to produce all seventy-five documents

identified on its privilege log, without redactions, or, in the alternative, order KW to produce these

documents to the Court for in-camera review to determine the merits of KW's privilege assertions."

Dkt. No. 22 at 11.  Once again, the Court disagrees.

As Keller Williams points out in its response, it is not obvious that the redaction from the

CFO's email was improper.  The email was forwarding to the general counsel the first of the two

disputed invoices, notifying the general counsel that the company was not going to pay it until TPI

and Keller Williams entered into a letter of understanding "or whatever agreement you feel is most

appropriate."  TPI claims this was a pure "business" conversation, and not an attorney-client

communication.  That is not so clear, however.  The email informs the company's counsel of a

decision on handling the invoice based on a legal concern—the lack of a signed agreement—one

---

[5]Though it is unclear from the record, it appears that Keller Williams' former CEO, Chris
Heller, provided the unredacted email to TPI.  Dkt. No. 29 at 17.

the email suggests had already been discussed with the general counsel. If that reading is accurate, then the redacted sentence is properly construed as an attorney-client communication.

Regardless, TPI's conclusion that, assuming the sentence was improperly redacted, every single one of the 75 documents Keller Williams has logged as privileged is now suspect, is baseless. The attorney-client privilege is an important doctrine that is not so easily undermined. It is fundamental to the U.S. legal system. Even if the Court agreed with TPI that the sentence in the email had been improperly redacted, it would not justify the Court ordering Keller Williams to turn over to TPI 75 additional documents Keller Williams has asserted are privileged. Nor would it justify the Court reviewing each of these documents *in camera*. The *in camera* review of documents is an extraordinary action, reserved for situations when there is no other means by which the Court can reach a decision on an issue. Here, TPI has failed to provide any justifiable reason to question wholesale Keller Williams' assertion of privilege. Before the Court will order the production of documents for *in camera* review, TPI must make an individualized showing that there is reason to believe a particular document claimed to be privileged in fact is not. There is presently no basis to question the documents Keller Williams has claimed as privileged, and the motion to compel on this basis is denied.

### C. Interrogatories

Finally, TPI asks the Court to compel Keller Williams to more fully respond to four interrogatories. Three of these—interrogatories 4, 6, and 7—ask Keller Williams to identify who made the decision not to pay the two $300,000 invoices, and the date those decisions were made. Keller Williams responded by stating that in both instances the decision was a group decision, and identified those who participated in making the decision. It further stated that the decisions were

made in a series of meetings in the month of September 2015, among the already-identified decision makers. TPI claims these responses "are the definition of evasive." Dkt. No. 22 at 11. Once more, the Court disagrees. It is not a surprise that there were several people involved in a decision to leave two $300,000 invoices unpaid. Such a decision was likely to have consequences, legal and business, and thus merited discussion among several parties. And to the extent TPI is skeptical that there wasn't a single "final" decision maker on the issue, it can pursue that skepticism through depositions.

The final interrogatory at issue requests Keller Williams to identify "every date on which KW met with TPI in person, the length of each meeting, who attended each meeting, and the subject matter discussed during each meeting." Dkt. No. 22-1 at 46. Keller Williams responded by noting that the information is contained in documents it has already produced, such as emails, calendar invites and notes, and further stated that TPI "already has this information since it provided it in response to Keller Williams' Interrogatory No. 10." Dkt. No. 22-1 at 54. TPI complains that this response is inadequate and "disingenuous because KW made a nearly identical request to TPI, to which TPI provided a detailed, substantive response." Dkt. No. 22 at 12. Its complaint thus seems to be that Keller Williams' response was not an unqualified acceptance of the accuracy of TPI's list of meetings. The Court will therefore order Keller Williams to supplement its response to state unequivocally whether it agrees with TPI's meeting list. If Keller Williams disputes any of the meetings listed, it shall so state that and explain the basis for the disagreement, and if it contends the list is incomplete in any respect, it shall identify the missing meeting(s).

## II.     Keller Williams' Cross-motion to Compel

Keller Williams has also moved to compel, and seeks an order requiring TPI to produce three categories of information: (1) TPI's actual work product from the several months it was working

on developing the software for Keller Williams; (2) any communications that have taken place between Chris Heller (Keller Williams' former CEO) and James Cashiola (TPI's principal and the primary point of contact on the software project); and (3) contact information for each of the software developers who worked on the Keller Williams' app for TPI.

### A. TPI's Work Product

Keller Williams has propounded requests for production on TPI seeking the software application it was developing for Keller Williams. It notes that TPI's breach of contract, quasi contract, and promissory estoppel claims all contend that TPI did substantial "valuable" work for Keller Williams, and is therefore entitled to be paid for that work. Keller Williams asserts it is entitled to see what that work was. TPI responds that this argument is a "straw man" because it has already provided Keller Williams with a detailed spreadsheet "delineating every single task its software engineers performed in their 7,483 hours of work." Dkt. No. 33 at 1. Keller Williams replies that it has serious questions regarding the spreadsheet, and it is entitled to see the actual work product if, for no other reason, than to confirm that TPI actually did the work it invoiced Keller Williams for. The Court agrees. Not only are the reasons just stated a valid basis for the request, but any such software would also be relevant to TPI's trade secret misappropriation claim, as it may well confirm, or undercut, the assertions TPI has made regarding Keller Williams' alleged use of TPI's ideas. Whether those ideas are apparent from the work TPI did for Keller Williams would clearly bear on the merits of this claim. TPI must therefore produce the tangible work product it generated in the time it billed Keller Williams for.

## B.     Communications between TPI and Chris Heller

Keller Williams also served requests for production seeking any communications between TPI and Keller Williams' former CEO, Chris Heller. TPI contends it has fully responded to the request, as it has produced all of the communications between *the corporation* and Heller. Keller Williams disagrees, and contends that TPI's refusal to produce communications between James Cashiola and Heller shows that TPI has not complied with the request. It further notes that to assure that there is not a fight about procedural issues, it also served a subpoena on Cashiola individually for the documents. TPI responds that it has produced all of the records it has, and if Cashiola and Heller have communicated since the time suit was filed, Keller Williams must seek those records from Cashiola, not TPI. In a footnote, it adds that "Mr. Cashiola cannot be commanded to produce documents more than 100 miles from Park City, Utah [his residence], and KW's subpoena does not comport with Rule 45(c)(2)(A)'s geographical limits." Dkt. No. 33 at 7 n.7. Notably, TPI's counsel in this case also represents Cashiola, as it prepared and signed Cashiola's response to the subpoena (which amounted to 15 pages of objections). Dkt. No. 29-21.

TPI is correct that the Court is not currently in a procedural position to address Cashiola's refusal to produce documents, as the motion before the Court is a motion to compel *TPI* to respond to discovery. Having said that, the Court warns TPI and its counsel that its particularly "sharp" approach to this issue is not one that will serve it well in the long term. There is little question that Cashiola is an important witness to this case. He is the principal of TPI, and was the primary person Keller Williams dealt with during the parties' relationship. Any communications between Cashiola and Heller—who was CEO of Keller Williams when TPI was engaged to work on the app—are plainly relevant to this case. And the suggestion that communications after September 11, 2017, are

not relevant or discoverable is baseless. That is the date TPI and Keller Williams agreed they anticipated litigation, marking the beginning of when documents might be protected by the work product doctrine. Dkt. No. 29 at 17. This date thus has nothing to do with the discoverability of communications between Cashiola and Heller, as Heller is a third-party witness, and communications between him and Cashiola cannot be work product, regardless of their date. Accordingly, the Court warns TPI (and Cashiola) if they continue to play games with producing relevant communications, the Court will not hesitate to impose appropriate sanctions.

### C. Contact Information for TPI's Software Developers

The final issue raised by Keller Williams is its request that TPI produce the addresses and phone numbers for the TPI developers who did the work for Keller Williams. TPI objects to providing this information, as it contends that if Keller Williams wishes to contact these people, it must do so through TPI's counsel, since they are employees of TPI. Keller Williams replies that there is nothing in the information TPI has produced showing that all of the people who worked on the Keller Williams software were employees of TPI. As Keller Williams correctly notes, if the developers were not TPI employees, Keller Williams may contact them directly. The Court will therefore require TPI to supplement its response to this interrogatory, and identify whether the developers who worked on the Keller Williams software were employees of TPI, and for any developers who are not employed by TPI, it shall provide their name, employer, address and phone number.[6]

_____

[6]TPI complains that Keller Williams is being hypocritical in seeking this information, since it has not provided the parallel information for the individuals who worked on the software applications Keller Williams developed after it terminated its relationship with TPI. But as the Court has noted earlier, this is an apples-to-oranges comparison. TPI is suing Keller Williams for breach of contract, claiming it is entitled to be paid for work it did for Keller Williams. The individuals

III.    **Conclusion**

For the reasons set forth above, TPI Cloud Hosting, Inc.'s Motion to Compel Further Responses and Production of Documents (Dkt. No. 22) is **GRANTED IN PART**, and Keller Williams' Cross-motion to Compel (Dkt. No. 29) is **GRANTED IN PART**.  No later than March 16, 2020, Keller Williams shall supplement its response to Interrogatory No. 2 to state unequivocally whether it agrees with TPI's meeting list.  If Keller Williams disputes any of the meetings listed, it shall so state that, and if it contends the list is incomplete in any respect, it shall identify the missing meeting(s).  Also no later than March 16, 2020, TPI shall: (1) produce to Keller Williams the actual work product TPI created for Keller Williams; and (2) supplement its responses to interrogatories to identify whether the people who worked on the Keller Williams project were TPI employees, and for those who were not, who their employer was, and their address and phone number.  Any other relief requested that is not expressly granted above is **DENIED**.

SIGNED this 9th day of March, 2020.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

---

who did the work at issue are plainly relevant witnesses to TPI's contract and quasi contract claims. The same is not the case for the developers who wrote the Keller Williams software.  The only claim TPI has made that implicates Keller Williams' software is the misappropriation of trade secrets claim, and, for the reasons set out in the discussion of TPI's motion to compel production of records related to the Keller Williams apps, it is not obvious why the developers who created that software are witnesses on that claim. Regardless, TPI has not raised the issue in a motion to compel, and it is not before the Court.